UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

CRAIG FUQUA,

                                        Plaintiff,

        v.                                                          **DECISION AND ORDER**
                                                                    12-CV-046S

FIRST NIAGARA BANK,

                                        Defendant.

# I.  INTRODUCTION

Craig Fuqua alleges that his former employer, First Niagara Bank, discriminated against him on the basis of sex and religion in violation of Title VII of the Civil Rights Act of 1964 and New York State's Human Rights Law. He also alleges that First Niagara retaliated against him for filing a complaint with the New York State Division of Human Rights.

Currently before this Court is Defendant's motion for summary judgment. For the following reasons, that motion is granted.

# II.  BACKGROUND[1]

Sometime in June 2008, Craig Fuqua, a male born-again Christian, was hired as a credit analyst at First Niagara Bank. (Pl.'s Stmnt, ¶¶ 1–2; Docket No. 40. Fuqua Dep. 43:1-2; Docket No. 25-1. Indelicato Aff., ¶ 4; Docket No. 25-2.) Credit analysts, sometimes called "portfolio managers" are "required to prepare accurate, objective, and cogent write-ups based on in-depth analysis of financial data." (Def.'s Stmnt., ¶ 7; Docket No. 27.) For approximately one year, Fuqua worked alongside Angela Indelicato, who, at the time,

---

[1]This Court has accepted facts in each party's statement of undisputed facts (referred to as "Pl.'s Stmnt." and "Defs.' Stmnt." respectively) to the extent that they have not been controverted by the opposing party. See Local Rule 56(a)(2) (statements not specifically controverted are deemed admitted).

was also employed as a credit analyst. (Indelicato Aff., ¶ 4.) Their cubicles were in close proximity, and they would occasionally discuss personal issues. (Id., ¶ 5.) In those discussions, Indelicato would sometimes reference her brother, who is a Christian. In Fuqua's words, "[Indelicato] stated that, you know, she had a dislike of born-again Christians. Quote, born-again Christians. Her brother was a Christian and that the [sic] statement was all he does is go to church. And there was reference to a family fight, where . . . she didn't feel that her family should make amends with her religious brother." (Fuqua Dep., 60:10–14, 61:22–23.) In an affidavit submitted in connection with this action, Indelicato admits to sometimes discussing her family life and her brother with Fuqua, but she clarifies that her brother, while Christian, is not a born-again Christian. (Def.'s Stmnt., ¶ 76.)

In these conversations, Indelicato would also sometimes discuss her relationship with men. "And there was one conversation where she expressed that she was discouraged that she wasn't married, discouraged she didn't have children. Discouraged that her dating life really didn't seem to go anywhere." (Fuqua Dep., 63:20–64:2; 70:12.) She also commented that "all men suck" on "several" occasions. (Id., 64:18-19.) These comments were always made in connection with her personal life. (Id., 71:8-10.)

Though Fuqua allegedly believed these comments about men and Christians were inappropriate, he never told Indelicato – or, it seems, anyone else at First Niagara. (Id., 72:22–73:6.)

Those conversations eventually ended.  In May 2009, Indelicato was asked by their supervisor, Russ Gentner, "to oversee the written product of the other portfolio mangers." (Def.'s Stmnt., ¶ 9.) Then, on January 1, 2010, Indelicato was promoted to Assistant Vice President, Senior Portfolio Underwriter. She thus became the supervisor for the remaining portfolio underwriters, including Fuqua. Fuqua admits that "the comments were very limited

after she took over the former reporting line in January of 2010." In fact, he admits that virtually all the comments that he now complains of occurred in 2008 or 2009. (Def.'s Stmnt., ¶ 72.)  Roughly two or three years after the comments stopped, on May 5, 2011, Fuqua filed a complaint with the New York State Division of Human rights, claiming that Indelicato discriminated against him because of his religion. (Division of Human Rights Compl., attached as Ex. 1 of Brown Aff; Docket No. 25-1.)

Fuqua remained a portfolio manager during his tenure at First Niagara. In that position, his performance was reviewed annually. (Def.'s Stmnt. ¶ 14.) In 2009, Gentner rated Fuqua in the middle category  – "Key Contributor" – of five possible performance grades.[2] Within that review, Gentner found that "management is generally satisfied with his work product." (2009 Officer Review, at 2; Docket No. 25-3.) But he also noted, among other things, that "improvement relative to [a management change] is needed. In order to show improvement in this area[,] it is highly recommended that Craig respond to management coaching, [and] take lessons  learned and apply them to future case work." (Id.) He later emphasized that "Craig will need to respond to coaching" and that he "needs to demonstrate continuous improvement on an on-going basis." (Id., at 3.) Gentner also suggested that he "reduce[] time spent on non-work related issues during the day and "where necessary work[] longer days." (Id.)

 In 2010, Indelicato, in her new role as Assistant Vice President, completed Fuqua's annual review. She found no improvement in his work product. She noted that "[c]o-workers have to ask numerous times for him to follow processes and procedures." (2010 Officer Review, at 1; Docket No. 25-2.) Although tasks were "predominantly completed on time," "quality and accuracy need to improve." (Id., at 2.) "He continues to be

_____

[2]The rating scale is as follows:  "Exceptionally High Performer," "High Performer," "Key Contributor," "Development Required," and "Significant Development Required."

argumentative[,] to the point of disrespecting his manager's role," Indelicato went on. (Id.) She also found that he continues to exhibit "poor work quality [and] behavior." (Id.) She assigned him an overall rating of "Development Required," the second-lowest available rating. (Id.)

After this review, Indelicato contends that his work performance continued to be below average. On March 4, March 21, and April 5, 2011, Indelicato met with Fuqua to discuss his need for improvement. In reports prepared after those meetings, she noted each time that Fuqua "has not met quality expectations." (Employee Conference Reports; Docket No. 25-2.) Other First Niagara employees have also expressed frustration with Fuqua because of errors and inattention to detail. (See emails attached as Ex. L to Indelicato Aff; Docket No. 25-2.)  Fuqua, however, has submitted two affidavits from co-workers who attest to his professionalism and respectful manner. (Stbeusz and Sciarra letters; attached as Pl.'s Ex. 7; Docket No. 33-2.)

Citing concerns those described above, First Niagara eventually fired Fuqua on June 14, 2011. Andrew Zanotta is the Senior Vice President and Director of Commercial Real Estate Credit Risk and Approval at First Niagara; he is Indelicato's supervisor and was ultimately responsible for discharging Fuqua from the bank. By way of affidavit, Zanotta testifies that he met with Fuqua after the 2009 performance review and that during the meeting, Fuqua was "openly disrespectful of Ms. Indelicato." (Zanotta Aff., ¶ 5; Docket No. 25-4.) After being instructed to put his concerns about Indelicato in writing, Fuqua sent Zanotta an email wherein he "launche[d] a highly unprofessional, personal attack on Ms. Indelicato." (Id., ¶ 8). He criticized her ability as a supervisor, but never mentioned any potentially discriminatory conduct. (Id., ¶ 10)

Zanotta further testified that Fuqua's job performance continued to deteriorate after the 2009 and 2010 reviews. (Id., ¶ 14.) In a March 2011 email, he wrote that Fuqua's

"uneven work product[,] as well as his lack of adherence to the stated organizational values are apparent and are continuing to the point where I do not view his career here as salvageable." (Id., ¶ 24.) He also noted that "the underlying issue is his stated personal dislike for Angela [Indelicato] and the resentment and frustration he feels from having to report to her." (Id., ¶ 23.) "Rather than make the necessary corrections and modifications," Zanotta wrote in March 2011, "he goes into denial mode and argues every point." (Id.)

In the end, Zanotta testifies that "it was clear to him that he was not remediable and his employment could not be continued." (Id., ¶ 34.)

## III.  DISCUSSION

### A.    Summary judgment standard

Rule 56 of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is "material" only if it "might affect the outcome of the suit under governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). A "genuine" dispute exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id. In determining whether a genuine dispute regarding a material fact exists, the evidence and the inferences drawn from the evidence "must be viewed in the light most favorable to the party opposing the motion." Adickes v. S. H. Kress & Co., 398 U.S. 144, 158–59, 90 S. Ct.1598, 1609, 26 L. Ed. 2d 142 (1970) (internal quotations and citation omitted).

"Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991) (citation omitted). Indeed, "[i]f, as to the issue on which summary judgment is sought, there is any

evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82-83 (2d Cir. 2004) (citations omitted).  The function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Anderson, 477 U.S. at 249.

## B.    Race- and religion-based discrimination

Courts in this Circuit analyze discrimination claims brought under Title VII and the New York State Human Rights Law in the same manner.  Therefore, this Court's consideration of Fuqua's federal discrimination claim applies equally to his New York Human Rights Law claim. See Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 609 (2d Cir. 2006).

Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e–2(a)(1); Desert Palace, Inc. v. Costa, 539 U.S. 90, 123 S.Ct. 2148, 2150, 156 L. Ed. 2d 84 (2003). Without direct evidence of discrimination, sex- and religion-based discrimination claims are analyzed under the Supreme Court's familiar McDonnell Douglas burden-shifting framework. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973); see also Patterson v. Cnty. of Oneida, N.Y., 375 F.3d 206, 225 (2d Cir. 2004). Under that framework, a plaintiff must first establish a *prima facie* case by adducing sufficient evidence to permit a rational trier of fact to find that he: (1) is a member of a protected class; (2) was qualified for his position and performing his duties satisfactorily; (3) was subject to an adverse employment action (4) suffered under "circumstances giving rise to an inference of discrimination." Terry v. Ashcroft, 336 F.3d 128, 137–38 (2d Cir. 2003); Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000). The Second Circuit

Case 1:12-cv-00046-WMS-HBS   Document 41   Filed 02/12/14   Page 7 of 12

has explained that an action must cause a "materially adverse change in the terms and conditions of employment," and not just "mere inconvenience," in order to qualify as "adverse." Fairbrother v. Morrison, 412 F.3d 39, 56 (2d Cir. 2005) (internal quotation marks and citations omitted). The burden of establishing a *prima face* case is not a heavy one. One might characterize it as minimal." Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000).

If the plaintiff succeeds in establishing his *prima facie* case, the burden shifts to the employer to offer a legitimate, non-discriminatory reason for its challenged action. McDonnell Douglas, 411 U.S. at 802; Terry, 336 F.3d at 138. If the employer does so, the McDonnell Douglas presumptions disappear, and, in a sex- or religion-based-discrimination case, the plaintiff must then set forth sufficient evidence to support a reasonable inference that discrimination occurred. See James v. N.Y. Racing Ass'n., 233 F.3d 149, 156 (2d Cir. 2000).

Ultimately, to sustain his claim, Fuqua must show that race or religion, or both was a motivating factor in an adverse employment action. 42 U.S.C. §§ 2000e–2(m);

**** 

Fuqua alleges that his firing was motivated religious- and sex-based animus.[3] He contends that comments that Indelicato made in 2008 and 2009 about her Christian brother and about males in general reflect a bias against those groups, and, further, that Indelicato's bias influenced Zanotta to such an extent that he decided to discharge Fuqua

---

[3]Fuqua also claims that the negative aspects of his 2009 and 2010 annual review were motivated by Indelicato's bias and that these reviews constitute adverse actions. (Pl.'s Br. at 7; Docket No. 33.) As an initial matter, the 2009 review was compiled by Gentner, not Indelicato. And further, these reviews cannot constitute adverse actions, as they were not "materially adverse change[s] in the terms and conditions of [his] employment." See, e.g., Siddiqi v. N.Y. City Health & Hosps. Corp., 572 F. Supp. 2d 353, 367 (S.D.N.Y. 2008) ("[N]egative evaluations, standing alone without any accompanying adverse results, are not cognizable"); Ludwig v. Rochester Psychiatric. Ctr., 550 F. Supp. 2d 394, 398 (W.D.N.Y. 2008); Browne v. City Univ. of N.Y., 419 F. Supp. 2d 315, 333-34 (E.D.N.Y. 2005) ("A negative evaluation alone, absent some accompanying adverse result such as demotion, diminution of wages, or other tangible loss, does not constitute an adverse employment action.").

in 2011.

Fuqua's termination from First Niagara is of course a materially adverse employment action. And there is no dispute that he was a member of two protected classes (male and Christian). But even assuming, for now, that he was qualified for his position and performing it satisfactorily,  he has failed to meet the final element of his *prima facie* case – no reasonable jury could conclude that  he was discharged under "circumstances giving rise to an inference of discrimination."

Fuqua can point to only a handful of stray, mostly harmless comments made well before he was eventually fired. Not only were those remarks remote in time and  admittedly made in the context of Indelicato's personal, outside-of-work relationships, but they were also made by someone other than the person who ultimately discharged him. As Defendant correctly points out, "Remarks made by someone other than the person who made the decision adversely affecting the plaintiff may have little tendency to show that the decision-maker was motivated by the discriminatory sentiment expressed in the remark." Tomassi v. Insignia Fin. Group, Inc., 478 F.3d 111, 115 (2d Cir. 2007). Indeed, "the more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination." Id.; see also Campbell v. Alliance Nat'l Inc., 107 F. Supp. 2d 234, 247 (S.D.N.Y. 2000) ("Stray remarks by non-decision-makers or by decision-makers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of the decision."). The remarks on which Fuqua relies were both especially oblique and particularly remote. Fuqua admits that virtually all the comments were made when he and Indelicato were co-workers, approximately a year and a half before he was discharged. See Nidzon v. Konica Minolta Bus. Solutions, USA, Inc., 752 F. Supp. 2d 336, 351 (S.D.N.Y. 2010) (dismissing claims based on remarks made 13 and 19 months before

plaintiff's termination).

What's more, Fuqua relies exclusively on these remote comments; he cannot identify, as he must, any other indicia of discrimination. See Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 468 (2d Cir. 2001) (stray remarks, coupled other indicia of discmination are necessary to prove a claim of employment discrimination); Rajaravivarma v. Bd. of Trustees for Conn. State Univ. Sys., 862 F. Supp. 2d 127, 154 (D. Conn. 2012) (dismissing Title VII case where plaintiff relied exclusively on stray, remote remarks).

Finally, even if Fuqua has proven his *prima face* case, it is irrefutable that Fuqua cannot overcome First Niagara's evidence that he was discharged for non-discriminatory reasons. The evidence – including a series of reports and emails reflecting an inattention to detail and inability to take criticism from supervisors, composed by various personnel at various times throughout Fuqua's tenure at First Niagara – is overwhelming. And, critically, those criticisms predate Indelicato's assumption of a supervisory role: Even Gentner noted in his 2009 review that "Craig will need to respond to coaching" and that he "needs to demonstrate continuous improvement on an on-going basis."

Perhaps the most compelling piece of evidence is Zanotta's March of 2011 email. In that email, drafted before Fuqua was discharged and obviously before this litigation commenced, Zanotta, after explaining his legitimate and non-discriminatory rationale, concluded that Fuqua's "career here" is not "salvageable."

Fuqua's claim that Zanotta was simply a pawn for Indelicato, and that he decided to fire Fuqua because of the unlawfully tainted reports of Indelicato, is not supported by the evidence. Although Fuqua testified that Zanotta told him, "I don't know you from Adam, but I got your number," (Fuqua Dep., 13:16–21), Zanotta testified that he met Fuqua four times while Fuqua was employed at First Niagara. (Zanotta Dep., 14:15–17.) And Zanotta's pre-litigation correspondence strongly suggests that he arrived at his own conclusion about

Fuqua's work product. His March 2011 email was based on "his take on the issues that Craig has raised." And in an email he sent to Fuqua on April 28, 2010, he told Fuqua that he needed to "improve his work product" and "be able to take direction," all while "hop[ing] that [Fuqua] take[s] [his] feedback seriously" and while telling Fuqua that he will have "every opportunity to succeed." (Email attached as Ex. A to Zannatta Aff; Docket No. 25-2.)

Although there can be no dispute that Zanotta relied in part on Indelicato's opinion, the totality of the evidence in First Niagara's favor, when viewed in balance with Fuqua's scant evidence that his reasoning was pretext, presents an inescapable conclusion: no reasonable jury could find that his discharge was motivated in any part by his status as a man or as a Christian. It is apparent that Indelicato and Fuqua did not get along. But there is simply not enough evidence, viewed in a light most favorable to Fuqua, to suggest that this rocky relationship was the result of any unlawful animus on Indelicato's part. Rather, it is equally apparent that, following a long chain of negative evaluations and a lack of adequate responses from Fuqua, Zanotta made a decision – free from unlawful discriminatory intent or influence – to release Fuqua. Defendant's motion for summary judgment on Fuqua's state-law and Title VIII claims is therefore granted.

## C.   Retaliation

Fuqua also claims that his discharge was in retaliation for his decision to file a claim of discmination with the New York State Division of Human Rights.

"To make out a prima facie case of retaliation, a plaintiff must demonstrate that '(1) [he] engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action.'" Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C., 716 F.3d 10, 14 (2d Cir. 2013) (per curiam) (quoting Lore v. City of Syracuse, 670 F.3d 127, 157 (2d Cir. 2012)).

The standard for Fuqua's claim of retaliation is somewhat different than that for his race- and religion-based discmination claims. To be sure, the McDonnell-Douglas burden shifting analysis still applies. See Stratton v. Dep't for the Aging for the City of N.Y., 132 F.3d 869, 879 (2d Cir.1997). And like his previous claims, to survive a motion for summary judgment in connection with a retaliation claim, Fuqua must not only present sufficient evidence to support a rational determination by a trier of fact that the purported non-discriminatory reason articulated by the defendant was false, but also evidence upon which a trier of fact may reasonably believe his assertion that retaliation was the true reason of his termination. Unlike his earlier claims, however, to sustain a retaliation claim, Fuqua must ultimately show that retaliation was the *but-for cause* of his termination. See Univ. of Texas Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2534, 186 L. Ed. 2d 503 (2013) ("The text, structure, and history of Title VII demonstrate that a plaintiff making a retaliation claim under § 2000e–3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer.").

First Niagara does not dispute that Fuqua has demonstrated a *prima facie* case of retaliation. The temporal proximity between his Human Rights complaint (May 5, 2011), which is a protected activity, and his discharge (June 14, 2011), which is an adverse action, likely establishes a casual connection for the purposes of a *prima facie* case. See, e.g., Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L. Ed. 2d 509 (2001).

But, as noted above, Defendant presents substantial evidence of non-retaliatory reasons for Fuqua's discharge. In this face of this evidence, Fuqua must present something more than mere temporal proximity. As the Second Circuit has noted, "[t]he temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a *prima facie* case of retaliation under Title VII, but without more, such

temporal proximity is insufficient to satisfy [plaintff's] burden to bring forward some evidence of pretext." El Sayed v. Hilton Hotels Corp., 627 F.3d 931, 933 (2d Cir. 2010) (per curiam). Fuqua's evidence on this score is insufficient. In March of 2011 – before Fuqua filed his discrimination complaint – Zanotta had already decided that his lack of professionalism and inattention to detail (regardless of whatever other skills Fuqua might have possessed or whatever opinions some co-workers might have had about him) merited discharge. In Zanotta's words, by March of 2011, his career at First Niagara was not "salvageable." Fuqua has failed to meet his burden that this conclusion was somehow influenced by a complaint of discrimination that he had not yet filed. Accordingly, this claim is dismissed.

## IV. CONCLUSION

No reasonable jury could conclude that Fuqua was terminated either because of his race, religion, or his decision to file a Human Rights Complaint. To the contrary, the evidence establishes that he was fired for non-discriminatory reasons. Accordingly, Defendant's motion for summary judgment is granted.

## V. ORDERS

IT HEREBY IS ORDERED, that Defendant's Motion for Summary Judgment (Docket No. 25) is GRANTED.

FURTHER, the Clerk of Court is directed to close this case.

SO ORDERED.


Dated:  February 9, 2014
          Buffalo, New York

/s/William M. Skretny
WILLIAM M. SKRETNY
Chief Judge
United States District Court